***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before the Deputy Commissioner and the briefs and arguments of the parties. The appealing parties have not shown good grounds to reconsider the evidence, receive further evidence, or rehear the parties or their representatives. Accordingly, the Full Commission affirms with modifications, the Opinion and Award of Deputy Commissioner Gheen.
 *********** EVIDENTIARY MATTERS
On March 10, 2011, Plaintiff filed a motion to supplement the transcript of exhibits by adding 159 pages of documents that were filed with the Deputy Commissioner but were not *Page 3 
included in the transcript. Plaintiff submitted the additional documents which were sequentially numbered from one to 159 and labeled as Index to Additional Exhibits for AppealUnder N.C. Gen. Stat. § 97-90(c). On March 21, 2011, Plaintiff filed a second motion to supplement the transcript of exhibits by adding to the transcript three sets of statistical data that was jointly introduced before the Deputy Commissioner on June 11, 2010, June 15, 2010 and July 2, 2010, of which the Deputy Commissioner took judicial notice. Plaintiff attached the missing exhibits, which were sequentially numbered from 160-279, to Plaintiff-Appellee's brief filed on March 21, 2011, labeled asIndex to Additional Exhibits for Transcript of Evidence. Both parties consent to the inclusion of these documents in the transcript of the evidence. In the discretion of the Full Commission, Plaintiff's motion to supplement the transcript filed March 10, 2011 and Plaintiff's second motion to supplement the transcript filed March 21, 2011 are hereby GRANTED.
 *********** ISSUES
1. Whether Defendants are liable for additional medical compensation, including but not limited to:
 a. Hyperbaric oxygen therapy;
 b. Stem cell research/therapy (this issue was withdrawn by Plaintiff at the hearing before the Deputy Commissioner as not yet ripe);
 c. Missing hours of 18-hours per day skilled attendant care from an outside agency;
 d. Remaining hours of 24-hour attendant care;
 e. Housing modifications or suitable housing; and
 f. Reimbursement and/or authorization for out-of-pocket medical expenses *Page 4 
and prescriptions.
2. What is Plaintiff's average weekly wage and compensation rate?
3. Plaintiff filed a Motion to Reconsider three issues contending:
 a. The division of hours of attendant care provided by Margit Mazza, 30% skilled/70% unskilled, was improperly calculated as it ignored six additional hours of skilled care provided by Ms. Mazza in lieu of an outside caregiver.
 b. A mathematical error in calculating Ms. Mazza's rate of pay for attendant care as $18.20. The correct amount should be $18.52.
 c. The failure to enforce the employment contract between Plaintiff's counsel and his client providing for a contingency fee as to future attendant care expenses is erroneous as the fee contracted for is not unreasonable under the circumstances of this case.
 ***********
The Full Commission finds as fact and concludes as matters of law the following stipulations of the parties:
 STIPULATIONS
1. The date of the admittedly compensable injury that is the subject of this claim is June 15, 2007.
2. At all relevant times, the parties hereto were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
3. At all relevant times, Defendant-Employer regularly employed three or more employees in the State of North Carolina. *Page 5 
4. At all relevant times, the carrier of workers' compensation insurance in North Carolina for Defendant-Employer was AIU Holdings (formerly AIG) (hereinafter collectively "Defendants").
5. The North Carolina Industrial Commission has jurisdiction over the subject matter and the parties involved in this case.
6. During the hearing of this matter before the Deputy Commissioner, the parties agreed to abate the issue of payment for stem cell therapy, until Plaintiff completes the next round of treatment, as additional time is needed to determine the benefits, if any, of such treatment.
 ***********
Based upon all of the competent credible evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Full Commission, Plaintiff was 62 years old. He served in the Army Corps of Engineers, where he was a Captain, and has run his own businesses after separating from the Army. He spoke three languages, when he could physically speak, and was healthy before his injury.
2. Plaintiff was President and one of the two owners of Defendant-Employer, which is in the business of recycling or waste pickup.
3. Plaintiff met his wife of 32 years, Margit Mazza, in 1976 while stationed on military assignment in Europe. She has an associate's degree in business administration and credits towards a college degree in international business management.
4. Plaintiff and Ms. Mazza lived for 28 years in Pennsylvania, and then moved to *Page 6 
Lexington, North Carolina for Plaintiff to form his business. Ms. Mazza performed accounting work for the company.
5. On June 15, 2007, Plaintiff sustained crush injuries to both of his legs when a tractor trailer driven by his son backed over him. Defendants accepted liability for Plaintiff's compensable injury by filing an Industrial Commission Form 60. The Form 60 indicated that Plaintiff's compensation rate was $754.00 per week.
6. Plaintiff was treated at Greenville Hospital Systems in South Carolina, where he underwent extensive surgeries with hardware implantation to both legs.
7. As a consequence of Plaintiff s orthopedic injuries, he experienced a fat embolism that caused brain damage, memory loss, spasticity or muscle tightening, anoxic encephalopathy, and hypoxia or decreased oxygenation to his brain. He was in intensive care and experienced a coma for seven weeks. Plaintiff also has tetraplegia, central sleep apnea, bladder and bowel incontinence, a dormant urinary tract infection, pneumonia with kiebisiella and enterococcus bacterial infections, methicillin-resistant Staphylococcus aureus (or MRSA), a tracheotomy that he recently coughed out leaving a hole or a "fistula," hypertension from medications prescribed while hospitalized, hyperglycemia from medications prescribed while hospitalized, and a PEG-tube and gastrostomy tube. All of these diagnoses and consequences are directly related to his compensable injury by accident.
8. Plaintiff was hospitalized at various facilities from June 15, 2007, through October 8, 2007, including Greenville Hospital Systems, Kindred Long-Term Acute Care Healthcare, Carolinas Medical Center and Carolinas Rehabilitation.
9. Upon his hospital discharge on October 8, 2007, Plaintiff was confined to a wheelchair and is now completely dependent on others for his care. Plaintiff's medical providers *Page 7 
recommended chronic institutional care in a skilled nursing facility or continuous skilled home health care from that point forward.
10. Since Plaintiff's injury, Ms. Mazza has been appointed as his legal guardian by Order of the General Court of Justice, Superior Court Division, Davidson County.
11. Ms. Mazza has provided extraordinary care for Plaintiff. The quality of her daily care for Plaintiff is a significant reason that Plaintiff's medical condition has not deteriorated. The medical records and expert testimony compel a finding that the Plaintiff's status in a home setting with care provided by Ms. Mazza has superior results to the consequences of placing Plaintiff in an institutional setting.
12. As a result of Plaintiff's compensable work injury, he has been dependent upon others for almost all activities of daily living, including bowel assistance, urinary assistance, eating, grooming, bathing, dressing, toileting, transferring from the toilet, transferring from the tub or shower, and transferring from beds, chairs, and wheelchairs. Many of his activities of daily living require the assistance of multiple caregivers providing concurrent services, one of whom has been Ms. Mazza. Plaintiff's medical records show that transfers at Plaintiff's medical appointments require at least two, usually three, and sometimes four people, even with the aid of a Hoyer lift.
13. Multiple and concurrent caregivers are also necessary for other aspects of Plaintiff's care, such as transferring him and supervising him while in a standing frame at his apartment.
14. Plaintiff has a tracheostomy tube, which often causes problems with proper nutrition. Ms. Mazza has purchased nutritional supplements for Plaintiff.
15. Plaintiff is dependent upon others to feed him. He has used a PEG tube and *Page 8 
gastrostomy tube through which processed food is transferred directly to Plaintiff's stomach.
16. Plaintiff is dependent upon others to reposition him. Ms. Mazza repositions Plaintiff periodically to discourage skin breakdown. While hospitalized, Plaintiff suffered from skin breakdowns and decubitiulcers. While out of the hospital and in the care of Ms. Mazza, Plaintiff has not had any skin breakdowns. Given the length of time that Plaintiff has been out of the hospital, the absence of skin breakdown is indicative of Ms. Mazza's exceptional care services.
17. Plaintiff is dependent on others for toileting and to clean up afterwards, and he is incontinent of both bowel and bladder. There is no room in his apartment for a bedside commode, and Ms. Mazza must launder four to six times a day. Plaintiff uses a catheter, but it sometimes comes off at night.
18. Linda Erickson, RN, CCM, CLCP is an expert in the field of life care planning and nursing.
19. Prior to the hearing before the Deputy Commissioner on June 29, 2009, Ms. Erickson prepared a life care plan for Plaintiff after exhaustive research of Plaintiff's medical records, attending some of Plaintiff's medical appointments, and conducting an onsite inspection of Plaintiff's residence in Pennsylvania. Ms. Erickson reviewed all of her recommendations with Plaintiff's healthcare providers. With one exception, she received endorsements of her recommendations. The one exception from Ms. Erickson's review is aids to independent living, such as over-the-counter supplies, which do not require a formal prescription before they are medically necessary.
20. Laura Weiss, RN, CLCP, CCM, CDMS is also an expert in the field of life care planning and nursing. *Page 9 
21. Before the hearing on May 5, 2010, Ms. Weiss supplemented Ms. Erickson's life care plan pursuant to the Interlocutory Opinion and Award. Ms. Weiss evaluated the division of hours in which Ms. Mazza was providing attendant care services to Plaintiff in terms of whether the services provided were skilled or unskilled based on her interviews with Ms. Mazza, activity logs that Ms. Mazza kept during the period between January 5, 2010, and January 18, 2010, and her knowledge of regulations and other authorities governing the characterization of certain services as skilled or unskilled.
22. The testimony of Ms. Erickson and Ms. Weiss is both probative on the issues and convincing, even though Ms. Weiss's testimony had minor variations in calculating the hours of services between skilled and unskilled. Defendants correctly note that the activity logs maintained by Ms. Mazza would reflect fewer hours of skilled services than the averages in the previous finding. However, the changing nature and needs of Plaintiff, as well as the totality of the circumstances, compel a finding that the average number of hours of skilled and unskilled attendant care services provided by Ms. Mazza to Plaintiff are consistent with the estimates made by Ms. Weiss.
23. While Defendants have generally disputed the recommendations made by Plaintiff's experts, the highly credible, probative recommendations contained in Plaintiff's life care plan and by both Ms. Erickson and Ms. Weiss are not factually contradicted.
24. Plaintiff has needed and will continue to need around-the-clock skilled attendant care services from multiple caregivers, including Ms. Mazza, during concurrent shifts since his hospital discharge on October 8, 2007.
25. Ms. Mazza is not certified to perform skilled care. By practical experience and informal training from health care providers, she has gained sufficient experience to competently *Page 10 
provide most skilled care required to Plaintiff. For example, she performs trach care, dressing changes, wound care, cough techniques, nutritional adjustments, transfers, and suctioning. She administers medications, including injections. She has also taught nurses from the outside agencies to perform certain skills, because the nurses assigned could not perform them. These services include (a) emptying Plaintiff's urine bag, (b) repositioning Plaintiff, (c) turning Plaintiff to dress him, (d) inserting and removing condom catheters, (e) trach care, (f) using Plaintiff's PEG tube, and (g) handling Plaintiff's Hoyer lift.
26. Although Ms. Mazza is providing a high quality of care for Plaintiff, she does not have the special skills involving the theoretical and conceptual understanding of Plaintiff's medical condition and needs, which are required of a registered nurse. For example, a registered nurse must assess a patient's health problems and needs, develop and implement nursing care plans, and maintain medical records. Licensed registered nurses can command compensation at a skilled rate even when non-skilled services are being provided. Ms. Mazza is not licensed as a nurse.
27. Plaintiff has required 32 hours of skilled attendant care services from multiple caregivers during each 24 hour day since October 8, 2007, through the present time and continuing, consisting of (a) 24 hours of skilled care from an outside agency and (b) eight hours of care by Ms. Mazza or other family members. Out of the 24 hours of agency care, Ms. Mazza has been providing six of those hours in addition to the remaining eight hours of the 32 hour total. Working the six additional hours per day that replaces all services from independent health care providers ensures Ms. Mazza some privacy for herself and with her husband. Ms. Mazza provides at least 14 of the total 32 hours of care each day.
28. Plaintiff contends that the six additional hours of care per day that replaces all *Page 11 
services from independent health care providers should be accorded status as hours of skilled care as Defendant would have to provide and pay for skilled nursing care absent Ms. Mazza's services and as Ms. Mazza is performing some skilled services during her work hours. The evidence shows that Ms. Mazza provides some skilled services during this period of time as well as services that are unskilled.
29. According to both expert life care planners, since October 8, 2007, the compensable rate for skilled nursing care in the market in which Plaintiff resides has been $50.00 per hour. However, this is the rate at which professional nursing agencies are paid and not the rate the actual caregivers are paid as employees of the agency.
30. Since October 8, 2007, and excluding any missed hours of agency care, Ms. Mazza has provided an average of 14 hours of attendant care services each day in addition to the 18 hours of nursing services that were scheduled with an outside agency/attendant care provider.
31. Based upon the greater weight of the evidence, a reasonable average of the hours spent providing these services is 30 percent skilled services, services ordinarily performed by a registered nurse, and 70 percent unskilled services, services that could be performed by a certified nursing assistant (CNA). These averages are also reasonable when applied to the six hours a day that Ms. Mazza provides attendant care.
32. As Ms. Mazza has provided a blend of skilled and unskilled attendant care services to Plaintiff, the hourly rate at which Defendants should compensate her for this care should blend the rates normally provided to skilled and unskilled providers as well. Government statistics and data submitted by the parties into evidence regarding the hourly rates of skilled and unskilled nursing services near Plaintiff's residence in Pennsylvania have provided a range of hourly rates for different skill levels of nursing services. Relying on compensation statistics *Page 12 
from York-Hanover and Lancaster, Pennsylvania, is appropriate in this case because they most accurately reflect wages for comparable services in Plaintiff's city of residence.
33. Defendants propose the lowest hourly rates in the range of this data and Plaintiff proposes the highest hourly rates. The base rate of pay established herein is calculated by averaging the high and low mean salaries in both areas for skilled and unskilled services. The average mean calculated for each area is then averaged. This method of calculation is appropriate as it accords a higher wage than the lowest wage paid for these services in recognition of the extraordinary quality of care that Ms. Mazza provides to Plaintiff and her practical experience in providing a range of skilled services, as well as consideration of the division of time in which Ms. Mazza, on average, performs skilled and unskilled services. The average of the low and high means in these geographical areas is $11.60 for unskilled services and $30.27 for skilled services. As correctly noted by Plaintiff in his motion to reconsider the August 19, 2010 Opinion and Award by the Deputy Commissioner, based on a division of 30% skilled services and 70% unskilled services provided by Ms. Mazza, the corresponding base hourly rate would be $17.20 ((30% x $30.27 = $9.081) + (70% x $11.60 = $8.12) = $17.20).
34. The hourly base rate should be enhanced because Ms. Mazza is performing attendant care as an independent contractor and not as an employee of Defendants. Therefore, Ms. Mazza will be liable for self-employment taxes rather than FICA taxes, which are generally split evenly between an employee and her employer. The current self-employment tax rate is 15.3%, representing 12.4% for Social Security and 2.9% for Medicare. Applying one-half of her taxable rate to the base hourly rate produces the appropriate hourly rate at which to compensate Ms. Mazza for her attendant care services to Plaintiff. Therefore, the appropriate hourly rate is $18.52 ($17.20 x 1.0765). *Page 13 
35. Defendants have authorized only a part of Plaintiff s total attendant care needs during various periods since October 8, 2007. Professional attendant care providers retained by Defendant frequently miss shifts. Ms. Mazza is forced to cover the missing hours of care for Plaintiff during this time, in addition to the time during which she routinely provides care. Ms. Mazza's report of physical exhaustion is credible and established as a fact.
36. Defendants have not provided or authorized the full amount of attendant care needed for Plaintiff. Defendants knew or should have known that the number of hours of attendant care they had authorized were inadequate for Plaintiff's needs. The extensive medical records and reports of medical case managers document Plaintiff's needs.
37. From October 8, 2007 through December 8, 2007, Defendants authorized only 12 hours of care per day by a CNA without skilled care competency. Defendants failed to provide and pay for a total of 1,220 hours of care during this period calculated at 32 hours per day needed minus 12 hours provided by Defendants multiplied by the 61-day period. Ms. Mazza provided the balance of the 32 hours of care services that Plaintiff required.
38. Written documentation from Defendants confirms that Defendants did not provide around-the-clock care for Plaintiff solely because it "would bring cost of home care to that of a skilled facility."
39. On November 27, 2007, Plaintiff began hyperbaric oxygen treatments, which involves the administration of highly pressurized and oxygenated air to re-oxygenate damaged tissue. While the FDA has approved hyperbaric oxygen therapy for many other diagnoses, the FDA has neither approved hyperbaric oxygen therapy specifically for traumatic brain injuries nor certified that such therapy is contraindicated for traumatic brain injuries. Plaintiff's physicians confirm that it is an off-label use in Plaintiff's case. However, there is some medical literature *Page 14 
supporting the use of hyperbaric oxygen therapy for Plaintiff's situation and some of the approved uses for hyperbaric oxygen therapy are analogous pathologically and medically to its use in Plaintiff's case.
40. After the first five sessions of hyperbaric oxygen therapy, Plaintiff experienced dramatic improvements cognitively and in function. For example, he asked for a specific breakfast item at the fifth session without cuing from another person, which had not happened since the injury. He started to speak better and more spontaneously after starting the therapy. He has progressed to eating solid food, as opposed to being dependent on pulverized food fed to him through a PEG-or G-tube. He also started to move both his upper and lower extremities in a more deliberate fashion, and his spasticity was reduced, which is a recognized benefit of hyperbaric oxygen therapy. There were also improvements in Plaintiff's use of his fingers.
41. Dr. Anthony LaCorte, who treated Plaintiff before and after he began the hyperbaric oxygen treatments and who observed Plaintiff's functional capacity during both periods, described these improvements as "miraculous."
42. Plaintiff continues to experience improvement in his condition since starting hyperbaric oxygen therapy. Erickson, who interviewed Plaintiff in December 2008 and again in June 2009, noticed a dramatic improvement in Plaintiff's ability to express himself verbally, his emotional status and cognition, and his function between the two interviews.
43. Plaintiff's authorized treating physicians have endorsed the continuation of Plaintiff's hyperbaric oxygen therapy, given his improvements.
44. Plaintiff has incurred approximately $14,750.00 for the cost of the hyperbarisc treatment through the date of the original hearing before the Deputy Commissioner on June 29, 2009. *Page 15 
45. The greater weight establishes that Plaintiff has experienced relief from hyperbaric oxygen therapy, at least in combination with the other treatment modalities he is undergoing.
46. Plaintiff was hospitalized between December 8, 2007, and February 18, 2008, at various hospitals due to a floppy and hypertonic epiglottis that caused respiratory distress, leading to a second tracheotomy. This was not a consequence of his hyperbaric oxygen therapy.
47. Elite Staffing Services (hereinafter "Elite") provided attendant care to Plaintiff during the 340 days between February 18, 2008, and January 22, 2009. Elite was unable to provide 1,349.75 hours out of the 18 hours of attendant care authorized by Defendants and there was a high turnover rate for its nurses. Ms. Mazza provided attendant care services for Elite's unfilled shifts in addition to the 14 hours to fill out the 32 hours of service required each day. A total of 6,109.75 hours of unpaid attendant care was provided to Plaintiff by Ms. Mazza during this period.
48. On January 22, 2009, a new agency, PSA, assumed responsibility for providing care to Plaintiff in addition to Ms. Mazza's care. PSA missed 140 hours of care out of the 18 hours of care authorized by Defendants between January 22, 2009, and April 30, 2009. PSA missed an additional 26 hours in May 2009. The hours of unfilled services are in addition to the 14 hours of care remaining in the 32 hours of necessary care per day.
49. Between January 22, 2009, and May 31, 2009, Defendants failed to provide a total of 1,972 hours of attendant care services calculated (1) 166 hours of *Page 16 
missing agency care plus (2) 14 hours of care each day by Ms. Mazza multiplied by the 129 days in this period.
50. Between June 1, 2009, and April 30, 2010, Defendants failed to provide a total of 5,085.2 hours of attendant care services to Plaintiff, calculated by adding the (1) 409.2 hours of missing agency care plus (2) 14 hours of care each day by Ms. Mazza multiplied by the 334 days in this period.
51. Ms. Mazza has continued to provide at least 14 hours of attendant care services to Plaintiff per day since May 1, 2010.
52. Although Plaintiff qualifies for placement in an institutional or a skilled nursing facility, care provided by Ms. Mazza and other family members has been superior. Residing in his home environment is preferable at this time as Plaintiff has received better care in a home environment than he would have received in a facility.
53. Plaintiff's medical condition and treatment are very complex, and Plaintiff would benefit from and needs medical case management services.
54. Ms. Mazza has purchased many supplies that have been necessary to take care of Plaintiff s injury, for which Defendants have denied reimbursement. Although some of the supplies require a formal prescription, most do not. The record establishes that Defendants have even paid for some of these supplies on previous occasions, but are currently denying payment for the same products.
55. The supplies include (a) hydrogen peroxide, distilled water, and other trach-cleaning supplies, (b) a stoma button, tape, and a "sto-measure" related to Plaintiffs trach, (c) a humidifier and air purifier to improve air quality for Plaintiff's breathing, (d) wheelchair pads and blankets, (e) draw sheets and materials to make handles for the draw sheets for transfers, (f) a food chopper or blender, pill crusher, Ensure, vitamin and mineral supplements for Plaintiff's nutritional needs through feeding tubes, (g) supplies and adapters for Plaintiff's feeding tubes, (h) suction tooth brushes, (i) skin wipes, lotion, no-rinse soap and shampoo, fish oil, baby powder, contour cushions, pillows, and covers for skin care, (j) knee pads, elbow pads, and a *Page 17 
backboard for transfers, plus materials to build the backboard, which Plaintiff uses in formal physical therapy, (k) condom catheters and Depends, undergarments for Plaintiff's incontinence, (l) probiotics and laxatives to help with the regularity of Plaintiff's bowel movements, (m) glycerin to prevent Plaintiff's mouth and nose from drying out too much, (n) Robitussin to improve secretions, (o) rubbing alcohol, skin prep, and paper towels for the administration of Plaintiff's condom catheters, (p) a portable pulse oximeter and supplies (such as bandages, Band-Aids, and probes) to monitor Plaintiff's heart rate and blood oxygenation, (q) medicine cups and other containers to make it easier to feed Plaintiff and to administer his medications, (r) a heat mitt to loosen up Plaintiff's muscles before doing range of motion exercises, (s) a blood pressure machine because Plaintiff's blood pressure drops, for example, while in the standing frame, (t) Tylenol as a pain-reliever before Plaintiff's therapy, (u) latex gloves for Plaintiff's caregivers to prevent the spread of germs to Plaintiff, (v) earplugs to help with ear pressurization during Plaintiff's hyperbaric oxygen therapy, and (w) shelving material to help store all of these supplies in Plaintiff's small apartment. This list is not exclusive of the medically necessary, but non-prescription, supplies that Plaintiff requires due to his injury.
56. The greater weight of evidence establishes that Plaintiff's use of these products is directly related to his compensable injury by accident.
57. At the time of hearing before the Deputy Commissioner, Plaintiff and Ms. Mazza were renting an apartment of approximately 800 total square feet that cannot be modified to the extent needed to accommodate Plaintiff's physical needs. Plaintiff's landlord will not consent to modifications.
58. The small apartment is crowded with Plaintiff's medical equipment, including but not limited to a Hoyer lift and hospital bed, a portable shower, a mat table, and a standing frame, *Page 18 
which are large or bulky items. The hospital bed leaves only two to three feet to maneuver in Plaintiff's bedroom.
59. Plaintiff needs suitable, handicapped-accessible and ADA-compliant housing with, for example, widened hallways and doorways, wheelchair ramps, accessible bathrooms with a roll-in shower, no carpets, a paved walkway to access transportation, a garage that can accommodate a handicapped-accessible van, voice-activated and environmentally accessible temperature and lighting controls, an alternate or backup power source, and code-compliant electrical wiring, among other things. The rental apartment is too small to accommodate a bedside commode in Plaintiff's bedroom.
60. Defendants have made no effort to locate suitable housing for Plaintiff after being asked to do so by Plaintiff.
61. Plaintiff is not safe in his rented residence. There have been two emergencies when the paramedics who came to the rental apartment had extreme difficulty in transferring Plaintiff from the premises due to the lack of space.
62. Plaintiff's doctors have specifically prescribed Lovenox as a prophylaxis for deep venous thrombosis. Defendants had Plaintiff's medication changed to Coumadin, a less expensive blood thinner.
63. Plaintiff's pre-injury average weekly wage is $1,435.33. The Industrial Commission Form 22 stipulated into evidence shows total earnings of $74,637.12 during the 52 weeks before June 15, 2007. Dividing this amount by 52 weeks produces an average weekly wage of $1,435.33.
64. Ms. Mazza, individually and as guardian of Plaintiff, executed a contract of employment with The Sumwalt Law Firm on March 10, 2008, which is predicated on a *Page 19 
contingency fee of 25 percent for any benefits paid including "the initiation or continuation of benefits for me, or derivative benefits such as payment for attendant care services by family members. . . ."
65. The undisputed contingency fee of twenty-five percent applied to Plaintiff's continuing disability payments of $754.00 per week, results in a monthly attorney fee of $816.33 that equates to $9,802.00 annually.
66. Plaintiff is entitled to compensation for attendant care services by his wife Monday through Friday for up to five hours per day from October 8, 2007, through the present time and continuing at a rate of $18.52 per hour.
67. Plaintiff's counsel is an experienced and skilled attorney in the legal area of workers' compensation.
68. Plaintiff's counsel represents that he has expended 215 hours in representing Plaintiff as of the date of the hearing before the Deputy Commissioner. The hours of service are not differentiated between those related to attendant care provided by Ms. Mazza and the other issues of record. However, the record supports that the majority of hours would be attributable to attendant care issues related to Ms. Mazza's attendant care services.
69. Defendants did not contest the payment of weekly disability payments to Plaintiff who is totally disabled. Defendant did not contest Plaintiff's general need and payment for attendant care. Defendants did contest the hours of care needed and the amount for Ms. Mazza's attendant care services. Defendants also contested the medical necessity for hyperbaric therapy and payment for a range of non-prescription medical supplies.
 ***********
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission makes *Page 20 
the following:
 CONCLUSIONS OF LAW
1. Plaintiff is entitled to all medical expenses incurred or to be incurred as a result of his compensable injury, for so long as such examinations, evaluations, and treatments may reasonably be required to effect a cure, give relief, or tend to lesson Plaintiff's period of disability. N.C. Gen. Stat. §§ 97-2(19); 97-25. Such medical treatment includes attendant care provided by Plaintiff's wife, a CNA, or LPN. Id.; Ruiz v. Belk Masonry Co., Inc.,148 N.C. App. 675, 559 S.E.2d 249 (2002).
2. Plaintiff has needed 32 hours of attendant care per day provided by multiple caregivers, including Ms. Mazza, from October 8, 2007, through the present time and continuing. N.C. Gen. Stat. §§ 97-2(19) 97-25; London v. Snak-TimeCatering, 136 N.C. App. 473, 525 S.E.2d 203 (2000).
3. In cases where family members provide attendant care services and the need for services is medically necessary, Plaintiff is not required to first obtain written authority for the rendition of attendant care services by his wife. N.C. Gen. Stat. § 97-90(a); Ruiz,148 N.C. App. 675, 559 S.E.2d 249 (2002).
4. Based upon the pay rate and self-employment tax data submitted by the parties and upon the greater weight of the evidence, the Full Commission finds that a reasonable rate of compensation for Ms. Mazza's attendant care services is $18.52 per hour. N.C. Gen. Stat. §§ 97-25; 97-26.
5. The greater weight of the evidence from Plaintiff's treating medical providers establishes that the hyperbaric treatment is reasonable and has provided relief for Plaintiff's compensable injuries. N.C. Gen. Stat. §§ 97-25. Therefore, Plaintiff is entitled to have *Page 21 
Defendants approve and provide the hyperbaric treatments.Id.
6. Plaintiff is entitled to medical case management services due to the complexity of his medical conditions. N.C. Gen. Stat. §§ 97-2(19); 97-25.
7. Due to Plaintiff's compensable work injury, Plaintiff needs and is entitled to have Defendants assist him in locating appropriate and suitable housing. Id.
8. Plaintiff's treating physician has prescribed and Plaintiff needs and is entitled to have Defendants provide Lovenox, not Coumadin. N.C. Gen. Stat. § 97-25.
9. The medical items and supplies purchased over the counter by Ms. Mazza, as identified in Finding of Fact 55, have been medically necessary to treat Plaintiff's medical conditions resulting from his compensable injury, as opposed to his ordinary needs of life. N.C. Gen. Stat. §§ 97-2(19); 97-25.
10. Plaintiff's average weekly wage is $1,435.33. The Industrial Commission Form 22 stipulated into evidence shows total earnings of $74,637.12 during the 52 weeks before June 15, 2007. Dividing this amount by 52 weeks produces an average weekly wage of $1,435.33, producing the maximum compensation rate of $754.00 for 2007. N.C. Gen. Stat. § 97-2(5).
11. Plaintiff is entitled to ongoing total disability benefits in the amount of $754.00 per week until further order of the Commission. N.C. Gen. Stat. § 97-29.
12. Plaintiff's counsel has provided valuable legal services including, but not limited to, the preparation and multiple trials of this complex case. Plaintiff's contract of employment with Plaintiff's counsel provides for a contingency fee of 25% of past due and future weekly disability payments and past and future attendant care provided to Plaintiff by Ms. Mazza. The contract is fair and reasonable as to payment of the contract contingency fee for past and future weekly disability benefits and attendant care benefits due Ms. Mazza. If the agreement is not *Page 22 
considered unreasonable, the Industrial Commission shall approve it. N.C. Gen. Stat. § 97-90.
13. Attendant care services, whether provided by professional heath care providers or non-professional family members, is classified as medical compensation which is defined as "medical surgical, hospital, nursing, and rehabilitative services . . . and other treatment . . . required to effect a cure or give relief. . . ." N.C. Gen. Stat. § 97-2(19); Godwin v. Swift Co.,270 N.C. 690, 155 S.E.2d 157 (1967); Palmer v. Jackson,161 N.C. App. 642, 590 S.E.2d 275 (2003); Levens v. Guilford Cty.Schools, 152 N.C. App. 390, 567 S.E.2d 767 (2002); Ruiz v. BelkMasonry Co., 148 N.C. App. 675, 559 S.E.2d 249 (2002);London v. Snak Time Catering, Inc., 136 N .C. App. 473, 525 S.E.2d 203 (2000).
14. A reasonable attorney fee in this case is the contingency contract rate of 25% of weekly disability benefits and for attendant care provided to Plaintiff by his wife, Ms. Mazza. N.C. Gen. Stat. § 97-90.
 ***********
Based upon the foregoing Stipulations, Findings of Fact, and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Subject to the attorneys' fee awarded hereinafter, Defendants shall continue to pay $754.00 per week in total disability compensation to Plaintiff until further order of the Industrial Commission.
2. Defendants shall authorize 18 hours per day of skilled agency attendant care for Plaintiff and pay the costs in accordance with Industrial Commission procedures.
3. Ms. Mazza is authorized to provide an additional 14 hours per day of attendant care to Plaintiff until further order of the Industrial Commission and may provide care for *Page 23 
Plaintiff for such additional times as necessary when skilled agency care is not provided by Defendants. For hours expended when skilled agency care is not provided as ordered herein, Plaintiff shall document the hours and send a bill, on a monthly basis, to Defendants in order that Defendants can reconcile Ms. Mazza's billing to those of the professional services for which Defendants are paying.
4. Subject to the attorney's fee awarded below, Defendants shall compensate Ms. Mazza for the (1) 14 hours of attendant care she is providing each day and (2) for the care she provides during the missing hours of agency care, as set forth in the Findings of Fact, at the applicable hourly rate.
5. Plaintiff's request for approval of hyperbaric treatments is approved until further order of the Industrial Commission.
6. Defendants shall, within 30 days of the date of this Award, recommend to the Industrial Commission a medical case manager to assist coordination of Plaintiff's medical care and serve the recommendation, accompanied by the professional qualifications of the individual, on the Industrial Commission and Plaintiff's counsel.
7. Defendants shall retain a qualified individual to assist Plaintiff in locating a suitable residence within Plaintiff's community in accordance with the life care plan submitted in this case.
8. Defendants shall pay for all Plaintiff's medical compensation that affects a cure, provides relief or reduces Plaintiff's disability in accordance with Industrial Commission procedures, including Plaintiff's past and future hyperbaric therapy, reimbursement to Plaintiff for the out-of-pocket expenses for medical items and supplies required as a direct result of Plaintiff's injury by accident, and Plaintiff's prescription for Lovenox. *Page 24 
9. Defendants shall pay Plaintiff medical compensation for the out of pocket expenses through the date of this Award as identified in the Findings of Fact and as submitted into the record evidence. Plaintiff shall provide Defendants with an itemization of the supplies and receipts for all items claimed. As to future non-prescription items, Plaintiff shall request from his treating physicians a statement as to the need for each non-prescription item required as a direct result of Plaintiff's injury by accident and present the physician's statement of need to the Defendants. Plaintiff shall then present bills for non-prescription medical supplies in accordance with Industrial Commission procedures.
10. Plaintiffs need for stem cell transplants is held in abeyance by agreement of the parties, who may pursue this issue in subsequent procedures before the Commission, if necessary.
11. Plaintiff's counsel is hereby awarded a reasonable attorneys' fee of 25% of ongoing disability compensation ordered in this Opinion and Award as well as all attendant care compensation paid to Ms. Mazza. Defendants shall pay attorney's fees to Plaintiff's counsel by deducting every fourth check or its equivalent (i.e., twenty-five percent of every check) from Plaintiff's or Ms. Mazza's compensation and paying the same directly to Plaintiff's counsel. Defendants shall deduct Plaintiff's attorney's fee for past due attendant care from the amount due to Plaintiff and pay the same directly to Plaintiff's counsel.
12. Defendants shall pay the costs.
This the 10th day of June, 2011.
 S/_________________ STACI T. MEYER COMMISSIONER *Page 25 
CONCURRING:
 S/_________________ PAMELA T. YOUNG CHAIR
 S/_________________ BERNADINE BALLANCE COMMISSIONER *Page 1